# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**JANICE WILSON STEVENSON,**                    Chapter 7
    Debtor                                Case No. 08-14084-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**JANICE WILSON STEVENSON,**
    Plaintiff,

v.                                              Adv. P. No. 08-1245
**EDUCATIONAL CREDIT MANAGEMENT
CORPORATION,**
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


### MEMORANDUM


## I. INTRODUCTION

The matter before the Court is the Complaint filed by Janice W. Stevenson (Ms. Stevenson" or the "Debtor") against the Educational Credit Management Corporation ("ECMC"), through which Ms. Stevenson seeks a discharge of her student loan obligations, totaling $114,680.69 as of April 11, 2011, pursuant to 11 U.S.C. § 523(a)(8).   In  her Complaint, Ms. Stevenson, who has appeared in the case and adversary proceeding pro se, alleged that, based upon her current circumstances, repayment of her student loans would constitute an undue hardship. She maintains that  she would be unable to maintain a

minimal living standard if she were required to repay the loans; that she has been chronically homeless for many years; and that she has made good faith efforts to repay her student loans.

The Court conducted a trial on April 13, 2011. The parties introduced four exhibits into evidence. At the trial, Ms. Stevenson was the only witness. Because she appeared pro se, the parties agreed that Ms. Stevenson could provide a narrative statement in presenting her case, that ECMC's counsel could examine her, and that Ms. Stevenson could provide a further narrative statement in rebuttal. Ms. Stevenson provided a narrative of her educational and employment history, her marital and health status, and her reasons for her refusal to participate in the repayment plans for student loans available under the United States Department of Education William D. Ford Direct Loan Repayment Program, *see* 34 C.F.R. 685, §§ 685.100 - 685.402.

The issue is whether Ms. Stevenson sustained her burden of establishing that excepting the debt from discharge would impose an undue hardship upon her or her dependents. In accordance with Fed. R. Bankr. P. 7052, the Court now makes the following findings of fact and conclusions of law.

## II. FACTS

Ms. Stevenson is a single female in her mid-fifties. She filed a voluntary Chapter 7 petition on June 3, 2008. On Amended Schedule F-Creditors Holding Unsecured Nonpriority Claims, which she filed on August 29, 2008, she listed claims totaling approximately $128,900, including ECMC with a claim of approximately $102,000. She did not list a claim for unpaid income taxes in the approximate amount of $8,000. At trial, Ms.

Stevenson explained that she deliberately did not list the claim because she intended to proceed with an offer in compromise, and that she has not filed tax returns due to the ability of the IRS to set off any refund she may be owed.

Ms. Stevenson commenced the instant adversary proceeding on September 10, 2008, two days after the Trustee filed the Report of No Distribution and one day after she received her Chapter 7 discharge. Ms. Stevenson received her discharge of dischargeable debts on September 9, 2008. At trial, ECMC introduced evidence, which was unrebutted, that the amount of Ms. Stevenson's student loan debt owed to it was $114,680.69.[1]

---

[1] Prior to the trial, the parties filed a Joint Pretrial Memorandum on November 1, 2010 in which they agreed that ECMC holds four federal student loans with a total outstanding balance as of October 5, 2010 of $112,579.91 as follows:

A student loan that disbursed on December 27, 1983 under the federal Guaranteed Student Loan Program ("GSLP"). As of October 5, 2010 the loan had an outstanding balance of $7,618.81, of which $2,717.45 is for principal, $3,522.15 is for interest, and $1,379.21 is for costs. The loan has a fixed interest rate of 9% and a per diem of .67 cents.

A student loan that disbursed on December 27, 1983 under the GSLP. As of October 5, 2010 the loan had an outstanding balance of 44,967.46, of which $1,771.78 is for principal, $2,296.44 is for interest, and $899.24 is for costs. The loan has a fixed interest rate of 9% and a per diem of .44 cents.

A Federal Consolidation Loan that disbursed on April 30, 1992 under the Federal Family Education Loan Program. As of October 5, 2010 the loan had an outstanding balance of $57,744.09, of which $422,021.74 is for principal, $25,328.00 is for interest, and $10,394.35 is for costs. The loan has a fixed interest rate of 9% and a per diem of $5.43.

A student loan that disbursed on June 10, 1987 under the Federal Supplemental Loans for Students (SLS) program. As of October 5, 2010 the loan had an outstanding balance of $57,744.09 of which $14,128.79 is for principal, $20,628.08 is for interest, and $7,492.68 is for costs. The loan has a fixed interest rate of 12% and a per diem of $4.65.

Moreover, there is no dispute that the obligations owed by Ms. Stevenson to ECMC are student loans.

Ms. Stevenson's financial circumstances have been difficult for a number of years. She testified that she currently earns approximately $475.36 a month from her part-time employment as a photo specialist at Walgreens, where she works between 14.25 hours to 18.5 hours a week.  In addition to her wages from Walgreens, Ms. Stevenson receives unemployment benefits of approximately $132 a week.  Those unemployment benefits, however, are subject to change based upon her weekly earnings and are scheduled to terminate in or around July of 2011.  Accordingly, at the time of trial, Ms. Stevenson's total gross monthly income was approximately $1,000 per month.

Ms. Stevenson currently resides in Chelsea, Massachusetts in a rent subsidized apartment for which the monthly rent is $1,109.  Before obtaining this apartment in 2009, Ms. Stevenson was homeless for a number of years and lived in shelters.  Because she receives a $700 monthly housing subsidy from the Metropolitan Boston Housing Partnership designed to assist previously homeless persons, Ms. Stevenson's monthly rental obligation is $409, substantially less than the monthly rent of $1,109.  Ms. Stevenson introduced as Exhibit One, a document, entitled "March 2011 Monthly Budget Report." In that exhibit, she reported monthly income of $475.36.  Her budget did not include weekly unemployment benefits of $132.  Ms. Stevenson's monthly expenses consist of her rent obligation of $409,  as well as $50 for transportation, and $25 for food. The amount of her

expenses are obviously insufficient to cover those and other unlisted, reasonable and necessary expenses.  Including the  unemployment benefits in her income, she has $591 available per month to cover her expenses for food, transportation, and other necessities.

Ms. Stevenson testified that she initially received a rental subsidy in 2009 and is entitled to receive a subsidy for three years; however, she also indicated that she may be entitled to assistance for just two more years.  If she does not qualify for a rental subsidy, Ms. Stevenson opined that she could become homeless again.  She also observed that some homeless shelters have stringent rules which might prevent her from retaining her job at Walgreens, further undermining her financial stability.

In 1976, Ms. Stevenson received a B.S. in business administration from Grambling State College, now known as Grambling State University, in Louisiana.  After graduating from Grambling State, Ms. Stevenson continued to reside in Louisiana until she was forty years old.  During that time, she married, subsequently divorced, and had four children, whom she raised as a single parent.  According to her resume, which was introduced into evidence by ECMC as Defendant's Exhibit One, Ms. Stevenson worked in various clerical positions for Kelly Services as a buyer and an Excel specialist between January 1992 to June 1997.  During that time, she earned between $22,000 and $25,000 a year.

When she could no longer find work in Louisiana, in approximately 1997, Ms. Stevenson moved with her children to Texas.  She drove with her family to Texas, leaving her furniture behind as she lacked the financial resources to engage movers.  The family had no place to stay in Texas, and they lived in a homeless shelter where they stayed until about 2000 or 2001.  In 1997 Ms. Stevenson obtained a job with Collin County Community

College, where according to her resume she prepared and maintained data tracking spreadsheets, reconciled purchasing records, responded to purchasing information inquiries, certified vendor quotes, negotiated, and drafted contracts, and processed purchase orders. While working as a buyer at Collin County Community College, Ms. Stevenson took classes and, in 1999, received a certificate in Network Software Technology from that institution. Her course work for the certificate was paid for by the community college as part of its professional development program.

In 2001, Ms. Stevenson left Collin County Community College to work for Matrix Communication as an inventory analyst. The company was a start-up and after three months, in approximately March 2001, Ms. Stevenson lost her job and started receiving unemployment compensation. After losing her job with Matrix, Ms. Stevenson moved to another homeless shelter in Texas and, in August 2001, started working at Piccadilly's restaurant for $7 an hour.

In September 2001, Ms. Stevenson left Texas and moved her family to New Hampshire where her oldest son was a student attending Dartmouth College. While living in New Hampshire, Ms. Stevenson worked for approximately nine months as a buyer for a research and development entity she identified as Spectra, which specialized in high caliber printheads and other products. While there, she utilized software which she identified as the Oracle Purchase Module.

In 2002, Ms. Stevenson left New Hampshire and moved to Massachusetts without her family. After moving to Massachusetts, she lived in a homeless shelter. Soon after moving to Massachusetts, on January 17, 2003, Ms. Stevenson filed a Chapter 13 petition,

Case No. 03-12304-JNF, which was dismissed on May 22, 2007 and later closed on September 17, 2009 following the disposition of an appeal filed in the case by Ms. Stevenson.  As in the instant case, Ms. Stevenson represented herself.

Between March of 2003 and September of 2006, Ms. Stevenson was employed at the Metropolitan Boston Housing Partnership and, according to her resume, the Neighborhood House Charter School.  She was a word processing specialist at the Partnership and the Finance Manager at the School.  Ms. Stevenson was embroiled in litigation with the Charter School for a number of years.[2]

Ms. Stevenson found an apartment in the Boston area and brought her children to Massachusetts to live with her.  Ms. Stevenson eventually lost whatever jobs she may have had and her apartment, which forced her and her youngest daughter to move to a homeless shelter in Massachusetts.  Between March 2003 and September 2006, in addition to her association with the Partnership and the School, Ms. Stevenson found temporary employment through Ace Employment Services, earning $8 to $10 an hour.  In March 2008,

---

[2] The Court takes judicial notice that the Charter School filed an Opposition to the Debtor's Motion for Protection against Discriminatory Treatment and requested sanctions against Ms. Stevenson.  In its Opposition, the Charter School represented that Ms. Stevenson founded a company called TuckNT as a sole proprietorship in November of 2002 and that in November of 2004 that company was awarded a contract to provide services to the School, including administration of the accounts payables, accounts receivable, payroll, human resources, and grant management functions for a flat rate of $1,000 per week and was paid $43,000 during the nine month relationship which began in August of 2004.  Ms. Stevenson commenced legal action against the School in the United States District Court for the District of Massachusetts and asserted a wide variety of claims against the school, which she did not initially disclose on Schedule B-Personal Property.  On December 15, 2006, this Court entered sanctions against Ms. Stevenson in the sum of $500.

Ms. Stevenson found a temporary position with NECCO which paid $19 an hour, but as a result of taking the job, Ms. Stevenson and her daughter were "put out of the shelter" for exceeding the shelter's income limits.

In May 2008, Ms. Stevenson began working at a Walgreens in Waltham, Massachusetts as a photo specialist. In June 2009, she began receiving the subsidy from the Metropolitan Boston Housing Partnership and moved to Franklin, Massachusetts. Ms. Stevenson originally commuted between Franklin and Waltham until sometime in the Spring of 2010 when Walgreens opened a store in Franklin and she was transferred to that location. Her monthly rent in Franklin was $900. In March 2010, she moved to Chelsea, Massachusetts "to try to seek employment in a metropolitan area." As noted above, her rent is now $1,109 per month for which she receives a $700 per month subsidy.

Ms. Stevenson worked at the Walgreens in Franklin until April 8, 2011 when she transferred to a Walgreens in Cambridge. Her schedule at Walgreens is currently Thursday, Friday, and either Saturday or Sunday from 8:00 AM to 3:15 PM. Her schedule is structured so that she has time to attend classes and look for additional employment. Since transferring to the Walgreens in Cambridge, Ms. Stevenson has asked for more hours, up to 30 hours a week, between Thursday and Sunday, but at the time of trial, there had been no change in the number of her hours.

While working at Walgreens, Ms. Stevenson has attended classes at Cambridge College and Boston University; she is currently attending Bunker Hill Community College. Ms. Stevenson began attending Cambridge College in 2008 and was seeking a Masters of Management, but she stopped going there in 2009. Ms. Stevenson took two courses at

Boston University.   Her tuition was paid from an Individual Development Account ("IDA").[3]  Ms. Stevenson is in her last semester at Bunker Hill Community College, from which she expects to receive a Certificate in Picture Archiving Communication Systems ("PACS"), a health care information technology program.  Ms. Stevenson currently has an internship with the Cambridge Health Alliance.   The Massachusetts Rehabilitation Commission is paying for the course work required for the certificate from Bunker Hill Community College.

Ms. Stevenson  testified at trial that she intends " . . .  to pursue employment that [is] sustainable, where I can pay my own rent and pay my bills; however, I have not been successful in obtaining additional work or work that will put me at an income level above poverty."  She explained that she "want[s] to be successful," and, to that end, she testified that she hopes to find a job as a PACS administrator which she believes will pay her about $60,000 a year.  Ms. Stevenson also hopes that she will be able to work at Walgreens long enough to participate in its 401(k) plan.

In addition to attending classes at Bunker Hill Community College and working at Walgreens, Ms. Stevenson is also trying to improve her financial situation by obtaining more hours at Walgreens or by finding additional or better employment.  She testified that she recently has applied for employment as a secretary and retail  at a convenience store called "Convenience," at Home Depot, at T.J. Maxx, and at Home Goods.  Additionally, she

---

[3] Ms. Stevenson described an IDA as a saving account sponsored by community development agency whereby any money saved will be matched when the funds are used for certain purposes, such as pursuing educational opportunities, starting a business, or purchasing a car.

applied for a position as a financial aid administrator at Bunker Hill Community College, but that position which was filled by another candidate. She testified that she is proficient with computers, having skill in Microsoft's Office Suite (Word, Excel, Access, and Power Point), as well as PeopleSoft Module, which she used at a temporary job with Massport.

To assist in her job search, Ms. Stevenson has a membership with the Career Center at South Street which provides counseling and resume classes, but not assistance in finding jobs. In the past, she has also registered with Jewish Vocational Services, where she received her initial IDA, for credit and financial management classes. Ms. Stevenson is, or has been, a member of the Cambridge Employment Program through which a job developer would send her leads for positions as a purchasing coordinator or in adminstration. In addition to counseling services and newspapers, Ms. Stevenson looks for possible employment on LinkedIn and Career Builders, and employment related websites.

Ms. Stevenson testified that her job prospects are circumscribed by health issues. She has back problems, high cholesterol and Hashimoto's Thyroiditis, an autoimmune disease for which she takes medication. She did not introduce any medical evidence to corroborate her testimony. However, ECMC did not introduce any evidence to rebut her testimony that she has health issues.

At trial, ECMC introduced into evidence a letter to Ms. Stevenson dated December 16, 2009, in which it set forth the five types of repayment plans under the Ford Program: 1) the Standard Repayment Plan Option; 2) the Extended Repayment Plan Option; 3) the

Graduated Repayment Plan Option; 4) the Income Contingent Repayment Plan Option;[4]

---

[4] The letter stated:

    The fourth option is the Income Contingent Repayment Plan ("ICRP") which has a maximum repayment term of 25 years.  If at the end of the twenty-five year term there is a loan balance remaining then the ICRP requires that the remaining loan be canceled.  The monthly payment amount under the ICRP Plan is calculated based upon the borrower's annual adjusted gross income ("AGI"), the total amount borrowed, and family size.  The monthly amount is calculated as the lesser of: (a) the amount that would be paid if the borrower repaid the loan in 12 years, multiplied by an annual income percentage factor that varies based upon the borrower's annual income; or (b) 20% of the borrower's discretionary income, which is defined as the borrower's adjusted gross income minus the poverty level for the borrower's family size.  If that calculation yields a monthly payment between zero and $5.00, the monthly payment is $5.00, unless the borrower's income is less than or equal to poverty level, *in which case the monthly payment is zero*.  If the monthly payment is less than the amount of the interest that accrues on the loans, the interest is capitalized, i.e. added to the principal, once a year until the principal balance reaches 10% more than the original principal balance.  At that point, interest continues to accrue but is not added to the principal balance.

    If at the end of the ICR Plan there is a loan balance remaining then the loan balance is canceled under the Ford Program.

* * *

    Under the ICR Plan option you would not be required to annually file renewal applications, etc.  Instead you would authorize the IRS to annually notify the ICR Plan of your AGI.  Your loan payment would then be set for the year based on your AGI.  If you don't file tax returns, then you would only need to complete a one page form declaring that you don't need to file a tax return as your income as [sic] under the required level, thereby confirming that your ICR Plan payment would be -0- for the year.

Defendant's Exhibit 2, Letter to the Debtor Dated December 16, 2009 (internal citations omitted).

and 5) the Income Based Repayment Plan Option.[5]  On cross-examination, Ms. Stevenson

admitted receiving the letter and having an awareness of the Income-Based Repayment

Plan Option.  She expressed reluctance to commit to any of the programs offered pursuant

to the Ford Program because of fear that her children would be liable for any tax liability

arising out of debt forgiveness.  When advised on cross-examination that her heirs would

not be liable for any such debt, and asked whether she would consider consolidating her

loans under that program, she stated: "If I knew that at the end of my life that there would

be no issues, probably; but I'm not seeing that."  During the course of the trial, Ms.

Stevenson rejected participation in the Ford Program, although the parties do not dispute

that she is eligible to participate in the program.

---

[5] The letter stated:

> The fifth option is the Income Based Repayment Plan ("IBR").  The IBR became available under the Ford Program as of July 1, 2009.  The IBR is available to borrowers who can make a showing of partial financial hardship; meaning that the payment amount on the Ford Standard Repayment Option exceeds 15% of your household AGI.  As such, your payment under the IBR Plan would be zero  (-0-) dollars per month.  The IBR Plan has a maximum term of 25 years and if at the end of the IBR Plan there is a loan balance remaining then the loan balance is canceled under the Ford Program.

> As your loans are in default, in order to consolidate into the IBR Plan you would first need to consolidate your student loans into the ICR Plan.  After you make three monthly payments of zero (-0-) dollars under the ICR Plan you would then be eligible to consolidate your student loans into the IBR Plan.

Defendant's Exhibit 2, Letter to the Debtor Dated December 16, 2009 (internal citations omitted).

## III. POSITIONS OF THE PARTIES

Ms. Stevenson maintains that repayment of her student loan debt would present an undue hardship because she cannot currently afford to repay the debt, and she is unlikely to be able to repay it in the foreseeable future.

ECMC argues that Ms. Stevenson failed to sustain her burden of establishing the existence of undue hardship. It asserts that Ms. Stevenson failed to show that her future prospects are bleak enough to warrant the discharge of her student loan debt. It concludes that her request for an exception to discharge must be rejected in view of her right to consolidate her debts under the William D. Ford Direct Repayment Loan Program.

## IV. DISCUSSION

### A. Applicable Law

The Bankruptcy Code prohibits the discharge of student loan debt "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). In determining whether a debtor has satisfied her burden in showing undue hardship, courts are split on the proper test to apply. Several circuit courts have adopted the Second Circuit's test set forth in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir.1987) ("the Brunner test"). The Brunner test is a three-part test which requires the debtor to prove:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

Brunner, 831 F.2d at 396. *See e.g.*, Educ. Credit Mgmt. Corp. v. Polleys, 356 F.3d 1302, 1309 (10th Cir. 2004); U.S. Dept. of Educ. v. Gerhardt (In re Gerhardt), 348 F.3d 89, 91 (5th Cir. 2003); Hemar Ins. Corp. v. Cox (In re Cox), 338 F.3d 1238, 1241 (11th Cir.), *reh'g denied*, 82 F. App'x 220 (11th Cir. 2003), *cert. denied*, 541 U.S. 991 (2004); Ekenasi v. Educ. Res. Inst. (In re Ekenasi), 325 F.3d 541, 546 (4th Cir. 2003); United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1112 (9th Cir 1998); Pa. Higher Educ. Assistance Agency v. Faish (In re Faish), 72 F.3d 298, 306 (3d Cir. 1995), *cert. denied*, 518 U.S. 1009 (1996); and In re Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993). *See also* Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler), 397 F.3d 382, 385 (6th Cir. 2005) (in which the Sixth Circuit abandoned its hybrid-Brunner test and adopted the Brunner test).

Other courts have adopted "the totality of the circumstances test" which requires the court to consider "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case." Long v. Educ. Credit Mgmt. Corp. (In re Long), 322 F.3d 549, 554 (8th Cir. 2003). The United States Court of Appeals for the First Circuit has not adopted either test. In Nash v. Conn. Student Loan Foundation (In re Nash), 446 F.3d 188 (1st Cir. 2006), the First Circuit stated:

> We see no need in this case to pronounce our views of a preferred method of identifying a case of "undue hardship." The standards urged on us by the parties both require the debtor to demonstrate that her disability will prevent her from working for the foreseeable future. Appellant has a formidable task, for Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in ensuring the continued

viability of the student loan program takes precedence. <u>TI Fed. Credit Union
v. DelBonis</u>, 72 F.3d 921, 937 (1st Cir.1995).

<u>Nash</u>, 446 F.3d at 190-91.

While the First Circuit has not adopted either test, this Court in <u>Nash v. Conn.
Student Loan Foundation (In re Nash)</u>, No. 02-1466, Slip op. (Bankr. D. Mass. June 18,
2004), *aff'd*, 330 B.R. 323, 327 (D. Mass. 2005), and the United States Bankruptcy Appellate
Panel for the First Circuit have adopted the "totality of the circumstances test." <u>Bronsdon
v. Educ. Credit Mgmt. Corp. (In re Bronsdon)</u>, 435 B.R. 791, 801 (B.A.P. 1st Cir. 2010).[6]  The
Bankruptcy Appellate Panel, and the majority of courts in Massachusetts, have adopted the
"totality of the circumstances test" because "the <u>Brunner</u> test 'test[s] too much'" and
because the good faith requirement lacks support within the language of § 523(a)(8).
<u>Bronsdon</u>, 435 B.R. at 800-801.  While noting that undue hardship is measured at the time
of trial, 435 B.R. at 800, the panel in <u>Bronsdon</u> observed:

> Although the two tests do not always diverge in function, they do in form.
> <u>In re Hicks</u>, 331 B.R. at 26.  As the <u>In re Hicks</u> court noted: "While under the
> totality of the circumstances approach, the court may also consider 'any
> additional facts and circumstances unique to the case' that are relevant to the
> central inquiry (i.e., the debtor's ability to maintain a minimum standard of
> living while repaying the loans), the <u>Brunner</u> test imposes two additional
> requirements on the debtor that must be met if the student loans are to be
> discharged." <u>Id.</u> (emphasis in original).  Looking to the bankruptcy court's
> extensive analysis of the predominant tests in <u>In re Kopf</u>, the <u>In re Hicks</u>
> court agreed with <u>In re Kopf</u> that the <u>Brunner</u> test "test[s] too much." <u>Id.</u> at
> 27.
>
>       At first blush, the second <u>Brunner</u> requirement—a showing
>       that the debtor's "state of affairs is likely to persist for a

---

[6] <u>Bronsdon</u> is currently on appeal to the United States Court of Appeals for the
First Circuit.

significant portion of the repayment period of the student loan"—seems merely to resonate with the forward-looking nature of the undue hardship analysis. That is, under any undue hardship standard the debtor must show that the inability to maintain a minimum standard of living while repaying the student loans is not a temporary reality, but will continue into the foreseeable future.

Many courts interpreting and applying the second <u>Brunner</u> prong, however, place dispositive weight on the debtor's ability to demonstrate "additional extraordinary circumstances" that establish a "certainty of hopelessness." This has led some courts to require that the debtor show the existence of "unique" or "extraordinary" circumstances, such as the debtor's advanced age, illness or disability, psychiatric problems, lack of usable job skills, large number of dependents or severely limited education. . . . And, in the absence of such a showing, the court may conclude that the debtor has failed the second <u>Brunner</u> prong and the student loans will not be discharged. . . .

Requiring the debtor to present additional evidence of "unique" or "extraordinary" circumstances amounting to a "certainty of hopelessness" is not supported by the text of § 523(a)(8). The debtor need only demonstrate "undue hardship." True, the debtor must be able to prove that the claimed hardship is more than present financial difficulty. *See* <u>Kopf</u>, 245 B.R. at 742, 745. And the existence of any of the factors mentioned above may be highly relevant to a finding that the hardship will persist into the foreseeable future. But whether or not this Court subjectively views the debtor's circumstances as "unique" or "extraordinary" is, in a word, overkill.

<u>In re Hicks</u>, 331 B.R. at 27–28. We agree with this rationale and conclude that <u>Brunner</u> takes the test too far.

Furthermore, we agree that the "good faith" requirement of <u>Brunner</u> is "without textual foundation." <u>Id.</u> at 28 (citing <u>In re Kopf</u>, 245 B.R. at 741). Ultimately, the debtor must establish by a preponderance of the evidence that her present and future actual circumstances would impose an undue hardship if her debts are excepted from discharge. Irrespective of the test, the decision of a bankruptcy court, whether the failure to discharge a student

loan will cause undue hardship to the debtor and the dependents of the debtor under § 523(a)(8), rests on both the economic ability to repay and the existence of any disqualifying action(s).  The party opposing the discharge of a student loan has the burden of presenting evidence of any disqualifying factor, such as bad faith.  The debtor is not required under the statute to establish prepetition good faith in absence of a challenge.  The debtor should not be obligated to prove a negative, that is, that he did not act in bad faith, and, consequently, acted in good faith.

Bronsdon, 435 B.R. at 800-801.

In addition to adopting the "totality of the circumstances test," the Bankruptcy Appellate Panel, in Bronsdon, determined that the availability of the William D. Ford Direct Loan Program ("ICRP"), and the options offered through that program to borrowers, in particular the Income Based Repayment Plan ("IBRP"), was a factor to be weighed by the court but was not dispositive as to the issue of undue hardship.  It stated:

Courts considering the ICRP as a factor under the totality of the circumstances test evaluate both the benefits and drawbacks of the program for the individual debtor within his or her unique circumstances.  Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks), 406 B.R. 382, 393 (Bankr. D. Minn.2009).  Although these courts acknowledge that the ICRP reduces the immediate debt burden of the student loan debtor, they are often concerned about the longer term debt and tax consequences of the program.  They recognize that, although it may be appropriate to consider whether a debtor has pursued her options under the ICRP, participation in that program may not be appropriate for some debtors because of the impact of the negative amortization of the debt over time when payments are not made and the tax implications arising after the debt is cancelled.  Because of these considerations, the ICRP may be beneficial for a borrower whose inability to pay is temporary and whose financial situation is expected to improve significantly in the future.  See In re Vargas, 2010 WL 148632, at *4–5, 2010 Bankr.LEXIS 63, at *12–13.  Where no significant improvement is anticipated, however, such programs may be detrimental to the borrower's long-term financial health.  See id.; see also In re Wilkinson–Bell, 2007 Bankr.LEXIS 1052, at *16.

Central to this analysis is the idea that because forgiveness of any unpaid debt under the ICRP may result in a taxable event, the debtor who

participates in the ICRP simply exchanges a nondischargeable student loan debt for a nondischargeable tax debt. Such an exchange of debt provides little or no relief to debtors. *See* Thomsen v. Dep't of Educ. (In re Thomsen), 234 B.R. 506, 514 (Bankr.D.Mont.1999); *see also* In re Booth, 410 B.R. at 675–76; Durrani v. Educ. Credit Mgmt. Corp. (In re Durrani), 311 B.R. 496, 509 (Bankr. N.D. Ill. 2004), *aff'd*, 320 B.R. 357 (N.D. Ill. 2005); *but see* In re Brunell, 356 B.R. at 580–81 (holding that "[t]o the extent that the Debtor satisfies the requirements for participation in the Ford program, any tax liability based on the forgiven balance at that time is discharged."). For example, in In re Booth, the bankruptcy court stated:

> Application of the ICRP does not result in a discharge of the debt nor relieve the debtor from personal liability on the debt. Further action may, and will, be taken to collect the obligation, even if that action is simply requiring the debtor to provide annual financial information to the Department of Education. The ICRP does not grant a discharge, but lapse of a period as long as 25 years may result in cancellation or forgiveness of the debt. There is no provision in the regulation for "partial" cancellation or forgiveness of the obligation. Unlike a discharge, cancellation or forgiveness of a debt results in a tax liability. As interest accrues during the 25 years or lesser repayment period, the amount of debt cancelled will be quite large. The resulting tax liability would not be subject to discharge in a later bankruptcy proceeding.

> The focus of the ICRP is on deferral, not discharge, of debt. This is the antithesis of a fresh start. Congress has provided bankruptcy debtors relief which is not provided in the ICRP regulations. Compliance with ICRP regulations will not result in the same relief which can be granted by the courts under 11 U.S.C. § 523(a)(8).

410 B.R. at 675–76. In addition, many of these courts are concerned that the ICRP allows the Department of Education to substitute its administrative determination regarding undue hardship for the bankruptcy judge's statutorily mandated discretion under § 523(a)(8). *See* id.; *see also* In re Durrani, 311 B.R. at 509.

Bronsdon, 435 B.R. at 802-803.

The ICRP allows student loans to be consolidated and payments on the loans to be adjusted after taking into account poverty guidelines and a debtor's adjusted gross income. *See* 34 C.F.R. § 685.209.

B. <u>Analysis</u>

Regardless of whether this Court applies the <u>Brunner</u> test or the "totality of the circumstances test," the Court concludes that Ms. Stevenson failed to satisfy her burden of establishing undue hardship as of the time of trial. Under the "totality of the circumstances test," the Court first considers Ms. Stevenson's past, present, and reasonably reliable future financial resources. Ms. Stevenson has had a history of homelessness and poverty. Ms. Stevenson is currently working at Walgreens, is seeking additional hours at work, has an apartment, and is enrolled in classes at Bunker Hill Community College. Ms. Stevenson also testified that she is in the last semester at Bunker Hill Community College, that she is participating in an internship program at Cambridge Health Alliance, and that she expects to receive her certificate in PACS Administration, which she hopes will lead to a well paying position in the medical field with an annual salary of approximately $60,000.

Ms. Stevenson has had a history of obtaining employment, and she has held a wide variety of responsible jobs. She has been employed by Walgreens for a number of years. Ms. Stevenson testified that, in addition to her wages from Walgreens, she is currently receiving unemployment benefits and a subsidy to assist her with the payment of her monthly rent. Currently, Ms. Stevenson's monthly income is approximately $1,000 and her monthly expenses, while appearing to be understated in the amount of $474, are less than her income.

Ms. Stevenson's part-time employment at Walgreens has enabled her to take advantage of educational opportunities and an internship which may increase her chances of obtaining a well-paying job.  Ms. Stevenson is intelligent, resourceful, and persistent. She has enrolled in a number of college level courses designed to assist her in maintaining and polishing her computer and technology skills.  She testified that she is well-versed in Microsoft's Office Suite and other computer programs.  Although her age and health issues pose some challenges, they are not debilitating in the sense that she is unable to work and her future prospects are not dim.  Indeed, one could view her future prospects as brighter than they have been since she moved to Massachusetts.  While Ms. Stevenson introduced evidence concerning her job history, her current employment situation, and her health issues, the evidence she presented, when coupled with her pending graduation with a certificate in PACS Administration, weighs against a finding of undue hardship.

Nevertheless, it would be cavalier for the Court not to recognize that Ms. Stevenson's financial situation - - the receipt of her existing income, especially her unemployment compensation, and the continuation of her exiting expenses which reflect a sizable rental subsidy - - is precarious.  Were she to lose her rental subsidy or her unemployment compensation, without a concomitant increase in her working hours at Walgreens or the acquisition of another better paying position, her financial position could collapse, leaving her homeless once again.

The final factor to be considered under the "totality of the circumstances test" requires the Court to consider any additional relevant facts and circumstances surrounding Ms. Stevenson's particular bankruptcy case.   Ms. Stevenson testified that she considered

the ICRP proffered to her by ECMC, but that she had concerns about the tax ramifications

resulting from debt forgiveness in the event she was unable to repay her student loans at

the expiration of the 25-year term of the plan.   As the panel in <u>Bronsdon</u> observed, in

considering the ICRP as a factor in determining whether the debtor has shown undue

hardship under the totality of the circumstances test, courts must "evaluate both the

benefits and drawbacks of the program for the individual debtor within his or her unique

circumstances."  435 B.R. at 803 (citing <u>Brooks v. Educ. Credit Mgmt. Corp. (In re Brooks)</u>,

406 B.R. 382, 393 (Bankr. D. Minn. 2009)).

        The Court concludes that Ms. Stevenson's eligibility for an ICRP and, in particular,

the existence of the Income Based Repayment Plan, which became available under the Ford

Program on July 1, 2009, supports the Court's determination that her student loan debt is

not dischargeable.   Nevertheless, the Court is mindful that the substitution of one

nondischargeable debt for another, i.e., student loan debt for tax debt, would merely serve

to saddle Ms. Stevenson with overwhelming debt and reduce her incentive to achieve her

goal of putting poverty and homelessness behind her.

        The Court observes that in <u>In re Brunell</u>, 356 B.R. 567 (Bankr. D. Mass. 2006), the

court determined that "to the extent that the Debtor is obligated under any tax liability as

may exist under the tax laws in effect at that time, the presence of any such liability at the

end of one's working life would be a tremendous undue hardship incurred as the result of

the student loan."  356 B.R. at 580-81.  Accordingly, the court held that "[t]o the extent that

the Debtor satisfies the requirements for participation in the Ford program, any tax liability

based on the forgiven balance at that time is discharged."  <u>Id.</u> at 581.  *See also* <u>Fahrenz v.</u>

Educ. Credit Mgmt. Corp. (In re Fahrenz), No. 05-1657, 2008 WL 4330312 (Bankr. D. Mass. 2008).

This Court has reservations about the prospective discharge of a potential tax liability and elects to take a slightly different route to achieve the type of equitable result espoused by the court in Brunell. The Court must recognize that, while Ms. Stevenson's ability to repay at least a part of her student loan debt is now likely, it is by no means inconceivable that her financial circumstances may spiral downward in the future as they have so often done in the past, leading her back to shelters and joblessness. Thus, the Court finds that balancing 1) "the general purpose of the Bankruptcy Code to give honest debtors a fresh start," 2) "the interest in ensuring the continued viability of the student loan program [which] takes precedence," *see* Nash, 446 F.3d at 190-91 (citing TI Fed. Credit Union v. DelBonis, 72 F.3d 921, 937 (1st Cir.1995), and 3) Ms. Stevenson's employment history and prospects as single woman in her mid-fifties with some health issues and long spells of poverty and homelessness is compelled by the circumstances of this case.

A number of courts of appeals have held that 11 U.S.C. § 105 permits a bankruptcy court "to take action short of total discharge." Tenn. Student Assistance v. Hornsby (In re Hornsby, 144 F.3d 433, 440 (6th Cir. 1998); *see also* Miller v. Pa. Higher Educ. Assistance Agency (In re Miller), 377 F.3d 616, 620 (6th Cir. 2004) ("when a debtor does not make a showing of undue hardship with respect to the entirety of her student loans, a bankruptcy court may - pursuant to its § 105(a) powers - contemplate granting the various forms of relief discussed in Hornsby, including granting a partial discharge of the debtor's student loans."); Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman), 325 F.3d 1168, 1173 (9th Cir.

2003) ("bankruptcy courts may exercise their equitable authority under 11 U.S.C. § 105(a)

to partially discharge student loans."); *but see* <u>Hemar Ins. Corp. v. Cox (In re Cox)</u>, 338 F.3d

1238 (11th Cir. 2003), *cert. denied*, 541 U.S. 991 (2004) ("Because the specific language of §

523(a)(8) does not allow for relief to a debtor who has failed to show 'undue hardship,' the

statute cannot be overruled by the general principles of equity contained in § 105(a).").

The Court agrees with those courts which have ruled that § 105(a) gives the

bankruptcy court authority to fashion equitable relief in appropriate circumstances in

student loan discharge cases. This is such a case.  Although the Court hopes that Ms.

Stevenson is able to achieve her employment goals, those goals may not be feasible due to

the depressed job market and her age.  Although she failed to sustain her burden of

proving undue hardship at the time of trial, the Court recognizes that in the event that she

loses some of the benefits to which she is now entitled, such as her rent subsidy or

unemployment compensation, or if she is unable to successfully meet her goals for a new

job with increased income while participating in the Ford program, based upon her

testimony, she would be entitled to relief from some or all of her student loan debt because

her financial circumstances would be dire and significantly worse than her current state

of affairs.  Thus, repayment of any sums in excess of the sums required to be paid under

the Ford program's Income Based Repayment Plan Option would be an undue hardship

due to an adverse change in her financial circumstances.

Accordingly, rather than enter an order discharging a potential contingent and

unliquidated tax debt without notice to appropriate governmental authorities, the Court

shall enter an order discharging any student loan debt Ms. Stevenson is unable to repay

following her participation in the Ford Program.  If Ms. Stevenson were to participate in

the Income Based Repayment Plan Option and so inform the Court, and if Ms. Stevenson

faithfully abides by the terms and provisions of either the IBRP option or an ICRP, any

student loan debt which she may have at the expiration of the plan is discharged.[7]

## V. CONCLUSION

For the foregoing reasons the Court shall enter a judgment in favor of the Defendant

and against the Plaintiff with the proviso that if Ms. Stevenson informs the Court within

14 days of the date of this decision that she will participate in the Ford Program and

represent that she will in good faith abide by the provisions of the Income Based

Repayment Plan Option, then the Court shall enter a judgment partially discharging her

student loan debt to the extent any remains at the expiration of the repayment plan.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated:  August 2, 2011

---

[7] The Court notes that the ICRP requires the Debtor to authorize the IRS to disclose information to agents of the Secretary of the Department of Education.  34 C.F.R. 685.209(c)(7)(I).  Accordingly, the Debtor will have to provide for her $8,000 tax liability in some fashion.